# EXHIBIT B

1

# ORIGINAL

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ----------------------------------------------X
     ELIEZER LOPEZ AND SUHAIL LAUREANO,
3
                                        PLAINTIFFS,
4

5           -against-                    Case No.:
                                   17-CV-00181(LAP)
6

7    LUIS LINARES,

8                                       DEFENDANT.
     ----------------------------------------------X
9

10                        DATE:  MAY 30, 2019

11                        TIME:  10:20 A.M.

12

13

14                   DEPOSITION of an expert witness, ELAINE J.

15   CHIU, taken by the Defendant, pursuant to Subpoena and to

16   the Federal Rules of Civil Procedure, held at the New York

17   City Law Department, 100 Church Street, New York, New York,

18   10007, before Naomi Katz, a Notary Public of the State of

19   New York.

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3    EMERY CELLI BRINCKERHOFF & ABADY, LLP
            Attorneys for the Plaintiffs
 4          ELIEZER LOPEZ & SUHAIL LAUREANO
            600 Fifth Avenue, 10th Floor
 5          New York, New York, 10020
            BY:  O. ANDREW F. WILSON, ESQ.
 6

 7
      ZACHARY W. CARTER, ESQ.
 8    CORPORATION COUNSEL
      NEW YORK CITY LAW DEPARTMENT
 9          Attorneys for the Defendants
            LUIS LINARES
10          100 Church Street
            New York, New York 10007
11          BY:  PHILIP DEPAUL, ESQ.
                 RACHEL SELIGMAN, ESQ.
12               CAROLYN DEPOIAN, ESQ.
            File #:  2016-004750
13          Control #:  19-1763

14

15    ROMANO & KUAN, PLLC
            Attorneys for the Expert Witness
16          100 Lafayette Street, Suite 401
            New York, New York, 10013
17          BY:  JULIA P. KUAN, ESQ.

18

19

20                  *          *          *

21

22

23

24

25
```

E. J. CHIU

1    Q.    Yes, we can discuss it along the way and I'll

2    make a copy at our break.

3    A.    It's in reverse chronological order, so the first

4    two.

5    Q.    So I've just looked at the exhibit that you

6    have --

7    A.    Correct.

8    Q.    -- which is the more up-to-date copy of your list

9    of testimony.  So other than Broussard versus Simon and

10   Whitton versus River Cats, the two documents that we have

11   are the same, correct?

12   A.    Yes, they are.

13   Q.    Now, I want to ask you about the cases in which

14   you've testified as an expert.

15   A.    Sure.

16   Q.    So starting with the first one, Broussard versus

17   Simon --

18   A.    Yes.

19   Q.    -- where was that lawsuit located?

20   A.    The suit itself was located in Louisiana.  I was

21   deposed in California.

22   Q.    What was the nature of that case?

23   A.    Just as a clue, the bold print on which side of

24   the V is the case that the attorneys that I worked for.  So

25   as you look at the first column, you could tell whether I

E. J. CHIU

1    was a plaintiff or defense.

2         Q.    So in that case, who were you testifying for?

3         A.    Mr. Broussard's family.

4         Q.    And he was the plaintiff?

5         A.    Correct.

6         Q.    What the nature of that case?

7         A.    That case was a head-on collision with a Mustang

8    where Mr. Broussard was the front passenger and he died at

9    the scene as a result of the accident.

10        Q.    What was the nature of your testimony,

11   specifically?

12        A.    My testimony was focused on the biomechanics of

13   movement in a collision like that, specifically with a

14   failure of a seatbelt allowing Mr. Broussard to contact the

15   interior of the car.

16        Q.    Do you know if that case is still ongoing or is

17   it --

18        A.    It's ongoing.

19        Q.    Just let me finish the question before you

20   answer.

21        A.    Sorry.

22        Q.    Do you know if that case is still ongoing or has

23   it been resolved?

24        A.    It's ongoing.

25        Q.    The second case on your list is Whitton versus

E. J. CHIU

1    River Cats?

2       A.     Correct.

3       Q.     Where was that lawsuit brought?

4       A.     That lawsuit is in the County of Yolo.  The River

5    Cats are the baseball team for the Sacramento area.

6       Q.     So California?

7       A.     Correct.

8       Q.     Which part were you testifying for in that case?

9       A.     For Mr. Whitten.

10      Q.     And he was the plaintiff?

11      A.     Correct.

12      Q.     What was the nature of that case?

13      A.     Mr. Whitten was sitting beneath the strikeout

14   marker at the stadium of the River Cats and they had

15   approximately one-foot square aluminium composite signs

16   they would fly in that had a large K.

17      Q.     Do you mean the letter K?

18      A.     The letter K.  So a sign was dropped from the

19   next level up onto Mr. Whitten's shoulder.

20      Q.     What the nature of your testimony in that case?

21      A.     My testimony regarded the nature of injuries

22   sustained by Mr. Whitten due to a pointed sign striking his

23   shoulder and whether the injuries to his neck or shoulder

24   were consistent with that trauma.

25      Q.     Is that case still ongoing or has it been

E. J. CHIU

1    resolved?

2        A.    I think it's ongoing.  I'm not positive.  I

3    believe it's still ongoing.

4        Q.    Starting with the next, Cole versus Rojas,

5    R-O-J-A-S, according to this list that case was brought in

6    California, correct?

7        A.    Correct.

8        Q.    And you were testifying for an individual named

9    Rojas?

10       A.    Correct.

11       Q.    Is this a civil suit or a criminal suit?

12       A.    Civil.

13       Q.    What was the nature of your testimony in that

14   case?

15       A.    In this case, Mr. Rojas was a defendant.  I was

16   working for the insurance company that represented Mr.

17   Rojas.  And Mr. Cole stated that he had certain injuries as

18   a result of getting rear-ended by Mr. Rojas' vehicle.  And

19   my position and my opinion on that case was that the nature

20   of the rear-end accident was not sufficient to cause the

21   long-term disability that Mr. Cole has sustained.

22       Q.    Is that case still ongoing or has it been

23   resolved?

24       A.    I believe it has settled.

25       Q.    The next case Bray versus Carlisle, that's also

E. J. CHIU

1    brought in California, correct?

2    A.    Hold on, there are two Bray cases.  Yes, Mrs.

3    Bray was struck by Carlisle's vehicle and she suffered a

4    ruptured breast implant.  And I was asked to testify about

5    the forces and the likelihood that this accident caused her

6    breast implant to leak.

7    Q.    And you testified for Mrs. Bray in that case?

8    A.    Mrs. Bray.

9    Q.    And she was the plaintiff in that case?

10   A.    Correct.

11   Q.    Is that case still ongoing or has it been

12   resolved?

13   A.    That's ongoing.

14   Q.    So the next case is Hwang versus CCSF also

15   brought in California, what's the nature of that case?

16   A.    I'm going to -- as we get further along, I'm not

17   going to know the exact details.  I could look them up for

18   you.  But Mr. Hwang was suing the City and County of San

19   Francisco regarding a low-speed accident and injuries.

20   Q.    What was the nature of your testimony in that

21   case, if you remember?

22   A.    In that case the testimony regarded supporting

23   that there was enough forces sustained to Mr. Hwang's

24   vehicle to result in his injuries.

25   Q.    Is that still ongoing or has it been resolved?

E. J. CHIU

1     A.     I don't know.  I believe it's resolved.  I don't

2     know.

3     Q.     And you testified for the plaintiff in that case?

4     A.     Correct.

5     Q.     So the next case on the list is People versus

6     Pool.  That's a criminal case, correct?

7     A.     Correct.

8     Q.     And you testified for the criminal defendant in

9     that case, Pool, correct?

10    A.     Correct.

11    Q.     And that case was also in California?

12    A.     Yes.

13    Q.     What was nature of that case, if you remember?

14    A.     Mr. Pool was alleged to have assaulted his

15    girlfriend and there were extensive lacerations that the

16    public defender asked me to review in terms of the

17    consistency with blood and injuries sustained by Mr. Pool

18    versus any kinds of sharp objects or anything that he might

19    have had that could have caused these injuries.

20    Q.     What was the nature of your testimony?

21    A.     The nature of my testimony was that the client's

22    girlfriend had sustained a deep laceration with a large

23    area of degloving on her face that were not consistent with

24    trauma caused by fingers alone.

25    Q.     And you were retained by the Sante Clara County

E. J. CHIU

1    Office of the Public Defender in that case?

2        A.    Correct.

3        Q.    Was that case resolved?

4        A.    I believe so.

5        Q.    Do you know how?

6        A.    I think there was some kind of a split jury and

7    then I don't know ultimately if there was appeals still

8    going on.

9        Q.    When you say "split jury," you mean --

10       A.    In terms of convicting him say for the domestic

11   violence charges, there was enough question brought in how

12   could this degree of injuries have occurred when he had

13   basically no blood on his hands and no sharp edges to a

14   ring or anything that could have caused some kind of large

15   tissue tear across her face.

16       Q.    Did that testimony in that case have anything to

17   do with biomechanics?

18       A.    I would say that case was more based upon

19   experience in acute medicine, emergency medicine, and

20   seeing wounds and closing wounds in the emergency

21   department.  Unfortunately I've had to see a fair number of

22   domestic violence victims, too.  So I would say there were

23   no specific calculations to say biomechanics, no.

24       Q.    Why don't we go down to the next case, Nisley

25   versus Stanford Health Care --

E. J. CHIU

1    A.    Yes.

2    Q.    Also brought in California.

3          And from this Exhibit B, it appears you testified

4    for the defendant in that case?

5    A.    Correct.

6    Q.    What was the nature of that case?

7    A.    Mr. Nisley was riding a motorcycle at relatively

8    high speed and struck another car that drove in front of

9    him, made a left turn, and he flew over the vehicle and was

10   rendered paraplegic.  He also had severe internal injuries,

11   including tearing of his aorta.  This would be upper

12   thoracic area injuries.

13         The nature of the case was that Mr. Nisley's

14   family felt that Stanford had not noted an unstable

15   thoracic fracture and had potentially worsened his spinal

16   cord injury by not being more observant of spine

17   precautions or things like this.

18         It was a combination lawsuit where in the midst

19   of an acute resuscitation, the patient was initially in the

20   East Bay.  In San Francisco we have the East Bay and then

21   the Peninsula.  So he was initially brought to a hospital

22   called Eden where they did a trauma workup, they got all

23   these CTs, and found he had an aortic tear.

24         So then he was sent across the Bay to Stanford

25   where they have ability to deal with that kind of injury,

E. J. CHIU

1    but wasn't read on the original CT scan was the fact that

2    there was thoracic injury.

3        Q.    You mean an injury to his thoracic spine --

4        A.    Correct.

5        Q.    Which caused him to be, as you said, paraplegic?

6        A.    Paraplegic.  So in that case the question for me

7    was, was the injury to his spinal cord part of his initial

8    injury when he came off the motorcycle and landed on his

9    head, neck, shoulders or was any movement that he sustained

10   during the course of being taken care of at Stanford a

11   cause of worsening of his spinal cord injury.

12       Q.    What was your opinion, in this case?

13       A.    My opinion was -- and this does include

14   biomechanics.  I reviewed literature of the nature of

15   forces necessary to cause this type of fracture.  Then how

16   much displacement would be required of the vertebra, one

17   relative to the other, in order to cause this nature

18   fracture which involved basically crimping his spinal cord

19   before the vertebral bodies came back to a closer to normal

20   positioning.

21             And it was an extensive review of MRIs and

22   charts, CT scans that lead me to believe that the trauma

23   had happened at the time of his accident.  And then he

24   resulted in -- this resulted in edema or swelling, bleeding

25   of the spinal cord which worsened his neurological deficit.

E. J. CHIU

1   That was the course of the original injury and the

2   progression of that that led to his ultimate state of

3   paraplegic.

4       Q.    Do you know the outcome of that case?

5       A.    Yes, they settled.

6       Q.    Moving down to the next one, Garcia versus

7   Capital General Insurance, according to Exhibit B that case

8   was also brought in California, right?

9       A.    Correct.

10      Q.    According to the exhibit, you testified for the

11  defendant in that case?

12      A.    Correct.

13      Q.    To the best of your knowledge, what was the

14  nature of that case?

15      A.    This was a case of a gentleman, Mr. Garcia, who

16  was alleging chronic lumbar disc injuries and disability

17  after a low-speed rear-end accident.  And I was working for

18  Capital General.  I believe that was the insurance company

19  for the company he was working for.

20      Q.    What was the nature of your testimony in that

21  case?

22      A.    That the nature of the forces sustained in that

23  kind of rear-end accident would not have been enough to

24  cause him to have long-term deficits or long-term need for

25  medical care or long-term disability.

E. J. CHIU

1    Q.    Do you know whether or not that case was

2   resolved?

3    A.    It was an arbitration so I believe they settled

4   on something, but I don't know.

5    Q.    Moving down to the next case on the list, People

6   versus Clarkson, it appears from Exhibit B that you

7   testified on behalf of the criminal defendant in that case?

8    A.    Correct.

9    Q.    What was the nature of that case?

10    A.    You know, at this point I can't recall and it

11   looks like I was there twice.  So, I would have to look it

12   up.  I was defending Mr. Clarkson, helping the public

13   defender, and I just can't remember right now.

14    Q.    That's fine.

15          So why don't we do it this way.  For the rest of

16   the cases on the list, to your knowledge, did any of them

17   involve quadriplegia?

18    A.    There's a couple that were like high-speed motor

19   vehicle and death.  It's not quite quadriplegia, but it's

20   one step worse.

21          That's Cortez versus Caltrans on page 2 about

22   halfway down, do you want to know about that case at all.

23    Q.    Well, it didn't involve quadriplegia then, right?

24    A.    No, no, no.

25    Q.    Are there any other cases on the list that

E. J. CHIU

1   involved quadriplegia?

2       A.      Jiwani versus Schubbe, which is about six from

3   the bottom.  This may have been paraplegia as related to an

4   epidural spinal abscess that was arguably due to a

5   low-speed rear-end accident.

6       Q.      But again that involved paraplegia, not

7   quadriplegia?

8       A.      Paraplegia, right, okay.

9               Ms. Gilmore, Cindy Gilmore versus Gokcen at the

10  bottom of the page, she was a neck fracture but fortunately

11  not paraplegic or quadriplegic.

12              No, I would say for quadriplegic we would go with

13  Nisley versus Stanford Health.

14      Q.      Now, there's one specific case that I want to ask

15  you about before we move away from the exhibit.  And that's

16  on the second page, Branscum versus San Ramon Police.

17      A.      Yes.

18      Q.      In that case you testified for the plaintiff,

19  correct?

20      A.      Correct.

21      Q.      And that case was a federal case brought in the

22  U.S. District Court for the Northern District of

23  California, correct?

24      A.      Correct.

25      Q.      What was the nature of that case?

E. J. CHIU

1     A.     Mr. Branscum was -- he was at a bar and the

2     police showed up for other reasons and he backed his car

3     into the police car and then took off.  And he led the

4     police on a high-speed chase through miles and miles of the

5     East Bay losing one tire, having all the drama of scraping

6     rims and such.

7            When the police finally stopped him after he

8     crashed his van, it was very well-documented on the police

9     cameras that there was a bit of excessive force in

10    restraining him or arresting him.

11    Q.     What was the nature of your testimony?

12    A.     My testimony regarded the nature of his injuries,

13    mechanism of injuries.  He ended up with what's called a

14    pneumothorax where one of the lungs closed down, as well as

15    some injuries to the face and skull from being detained

16    forcefully.

17    Q.     What was your opinion in this case?

18    A.     That the nature of the police apprehension was a

19    bit aggressive for the situation and resulted in more

20    injuries than were necessary.

21    Q.     Do you have any experience in police practices?

22    A.     That was partially reviewed in the other experts

23    that they had.  For example the attorney had police

24    practice, you know, retired detectives or retired cops

25    speaking about what's appropriate use of force in that.  So

E. J. CHIU

1    I don't speak about that.  I've heard about it from a

2    different expert.

3        Q.    So I guess my question for you is:  Is there

4    anything in your background that would allow you to say

5    that the officers in that instance were aggressive or used

6    more force than was necessary?

7        A.    Well, I think if you looked at the video, that

8    was the issue.  The client Mr. Branscum was face down on

9    the ground, the police picked him up and then beat on him.

10       Q.    I guess my question is:  Is that a biomechanical

11   or an emergency medical opinion on your part?

12       A.    No.

13       Q.    So you just opine based on your review of --

14       A.    I believe --

15       Q.    Hold on, let me finish.  You just opine based on

16   your viewing of the video that the force in that case was

17   excessive?

18                  MR. WILSON:  Objection.

19       A.    I don't believe I am an expert in excessive

20   force, per se.  That is probably certainly a legal term and

21   something that the police and the attorneys talk about.

22              My point was to document the injuries were a

23   result of a very forceful arrest.  And I think the question

24   of excessive force was left to the specialist in that.

25       Q.    So did you issue a report in that case?

E. J. CHIU

1    A.    I believe so.

2    Q.    Did your report say that the force used was

3  excessive or did it not say that?

4    A.    I don't recall at this point.

5    Q.    And you were deposed in that case as well?

6    A.    Yes.  I mean, I was deposed.  It didn't go to

7  trial, if that's what you mean.

8    Q.    Right.  And in your deposition in that case, did

9  you testify that the force used by the police officers was

10  excessive?

11    A.    At this exact moment I don't recall, because I

12  know we're talking about a pretty fine excessive force of

13  definition and I don't recall.

14    Q.    Did you testify at the deposition that the force

15  used was unreasonable?

16    A.    I think the issue was -- I could say for certain

17  that all of the injuries sustained were a result of a very

18  aggressive arrest.  And we could see in the video blows to

19  the back and blows to the face and none of those existed

20  before the arrest, so I suppose that my role was

21  documenting when his injuries occurred.

22    Q.    Based on that, you opine that the force used was

23  aggressive?

24         MR. WILSON:  Objection.

25    A.    I would say that it was a strong force.  You

E. J. CHIU

1    know, I don't believe I was tasked with saying was this

2    excessive.  I believe I was tasked more with documenting,

3    looking at the medical records and showing where his

4    injuries came from.

5         Q.    Did you offer any view or opinion in this case

6    about the police officer's actions being inappropriate?

7         A.    You know, I don't recall.  And my hunch is

8    probably not, because things always look better on a

9    slow-motion video then they would have at the real scene.

10   So I think that was left up to the attorney.

11        Q.    So you didn't issue that opinion?

12        A.    No, no.  Just so you are aware, I was involved

13   defending three police officers in People versus Lubrin,

14   Rodriguez, and Farris.

15        Q.    So why don't we talk about that case.

16        A.    Sure.

17        Q.    What was the nature of that case?

18        A.    Officers Lubrin, Rodriguez, and Farris were

19   charged basically, with assaulting an inmate in the Santa

20   Clara County prison that resulted in his death.

21        Q.    What was the nature of your testimony in that

22   case?

23        A.    The nature of my testimony was to review medical

24   records at the scene, examine the actual cell, review

25   autopsy photos, and determine whether there were any points

E. J. CHIU

1    that were consistent with blows from the officers.  They,

2    in the prison, only have a little plastic stick they call a

3    URS stick.  That's all they have; they don't have any

4    knives or billy clubs.

5          And the question was, were marks on his body

6    consistent with getting kicked, stomped upon, or struck by

7    this one defensive device that they had.  And looking at

8    the overall cause of his death which was internal bleeding

9    from a ruptured spleen, I was asked could this have been

10   from something else.  We believe it was not actually

11   officers that struck him, but rather in really closely

12   looking at the case there were marks on his back that had

13   an exact angle that correlated with that stainless steel

14   sink toilet device that they have.

15         We believe that he was standing up on the toilet

16   and flipped and struck his posterior ribs and caused his

17   splenic rupture.  At least, I say we, the defense.

18   Q.    And that was your testimony?

19   A.    Correct.

20   Q.    Was there any video in that case?

21   A.    Of the actual testimony?

22   Q.    Of the actual incident.

23   A.    Oh, no, there wasn't.  The videos in that prison

24   were just in the central areas.  There were none of -- if

25   there had been, it probably would have been a lot easier

E. J. CHIU

1    case.

2    Q.    What was the outcome of that case?

3    A.    The officers were convicted.  The case has not

4    been closed in my office because I believe there are

5    appeals.

6    Q.    I see from Exhibit B that you testified in one

7    case in 2018, is there any particular reason for that?

8    A.    2018 was slow in terms of my InSciTech work,

9    InSciTech being this consulting work.  My predominant

10    occupation is an emergency medicine physician and it's 80

11    to 90 percent of my time.  I don't go out and solicit cases

12    for the reconstruction work.  A lot of them are internally

13    referred from other people in my company or we have ongoing

14    associations with certain law firms.  Say we have a large

15    number of cases that come from a law firm that defends

16    State Farm, there's a large number of those cases.  And I

17    just had not found any compelling cases.  I've worked on

18    some, but not been deposed.  And my emergency medicine work

19    was more important.

20    And last year, I also started studying

21    acupuncture and studied certification for physicians that

22    want to learn acupuncture.  So perhaps my extracurricular

23    was spent more on that time.

24    Q.    How would you define your area of expertise?

25    MR. WILSON:  Objection to the form.

E. J. CHIU

1     Q.     So in terms of your expertise would you say it's

2 more emergency medicine than biomechanics, or equal, or

3 otherwise?

4     A.     I think it depends on the case, what I'm

5 utilizing more.  I've done accident reconstruction with

6 simple car collisions.  When they're more complex, multiple

7 vehicles, vehicles flipping over, I have the more advanced

8 engineers in accident reconstruction look at those.

9          I would say from a biomechanics and injury

10 standpoint it's looking at injuries occurred, are they

11 consistent with this description or another description.

12 Are they consistent with the data that we have and then

13 utilizing literature behind that to say we've done tests on

14 bone, we can press this bone so much before it breaks or we

15 know we can bend or extend a disc this much before it

16 breaks.  And use those kinds of thresholds and say, well,

17 this force was quite small compared to what it would take

18 to herniate a disc, so then it's very unlikely this disc

19 herniated as a result of this kind of accident.  So that's

20 where the scientific background comes over into the

21 biomechanics.

22     Q.     In terms of the cases you've worked from a

23 biomechanical standpoint, would you say that most of those

24 are car accident cases?

25     A.     Hold on.

E. J. CHIU

1          MR. WILSON:  Objection to the form.

2     A.    A good number.  I don't know if it's most.  I'd

3  have to really sort it out for you.

4     Q.    What do you think the purpose of your testimony

5  in this case is?

6          MR. WILSON:  Objection.

7     A.    I was asked to review materials and make

8  calculations, estimations for whether Mr. Lopez more likely

9  fell off of a bridge with a railing or was pushed.

10    Q.    How will you help the jury in this case?

11         MR. WILSON:  Objection to the form.

12    A.    It's a long answer.  Do you want me to go from

13  the beginning and tell how I'm looking at the data?

14    Q.    No.  I mean, how will your opinion help the jury

15  in this case?

16         MR. WILSON:  Objection to the form.

17    A.    Based on analysis, in reviewing data, looking at

18  literature, my opinion is that Mr. Lopez landed forcefully

19  upon his head causing cervical fracture and neurologic

20  deficit, eventually quadriparesis.

21    Q.    Are you finished with your answer?

22    A.    No, no, no.  I would say the other part of the

23  opinion that's important is that the nature of the injury

24  to Mr. Lopez was not consistent with his jumping or losing

25  his hold on a hand railing in order to flip his body 180

E. J. CHIU

1      Q.      I mean for the specific purpose for preparing for

2    today's deposition.

3      A.      No.

4      Q.      Did you consult with any doctors or scientists to

5    prepare for today's deposition?

6              MR. WILSON:  Objection to the form.

7      A.      Scientists?

8      Q.      Well, let me put it this way:  Did you consult

9    with any other doctors to prepare for today's deposition?

10     A.      When you use the term "doctors," you mean M.D.s

11   or Ph.D.s?

12     Q.      I do.

13     A.      I did consult with Dr. Yamaguchi in my office.

14   He has a Ph.D.  in physics and has worked in accident

15   reconstruction biomechanics for probably close to 20 years.

16     Q.      Can I have Dr. Yamaguchi's first name?

17     A.      Wait, I just spaced out.  Hold on a minute.

18   Gary.

19     Q.      And he also works at InSciTech?

20     A.      Correct.

21     Q.      What did you talk to him about?

22     A.      The question that I asked Dr. Yamaguchi was

23   whether there would be a role for some type of computer

24   modeling.  There's a specific one called MADYMO, which is

25   capital M-A-D-Y-M-O, where one can model the physics of a

E. J. CHIU

1    body and apply forces and have it fall, jump.

2         He had particular experience in interesting falls

3    off of a tanker trucks.  He had a trampoline case which was

4    interesting.  They had someone found dead on a trampoline

5    with a broken neck and they couldn't figure out how did

6    that happen.  So using MADYMO in that case, he was able to

7    simulate the physics of the trampoline and have the person

8    jump further and further and further towards the rim and

9    there was a sweet spot where you would jump and flip upside

10   down.

11        So I was asking him, predominately MADYMO is not

12   cheap, whether there would be any utility in trying to do

13   modeling like that.

14   Q.     For this particular case?

15   A.     Correct.

16   Q.     When was consultation?

17   A.     Probably late last year.  I could look at the

18   invoices to tell you exactly.

19   Q.     We're actually going to get to that and I'll you

20   ask questions about that then, but let's close this out

21   first.

22   A.     Okay.

23   Q.     In preparation for today's deposition

24   specifically, did you consult with any other doctors --

25   A.     No.

E. J. CHIU

1     to analyze, if there was any way we could use it to analyze

2     this fall.

3          Q.     What was the determination that you and you

4     Dr. Yamaguchi made about using that technology?

5          A.     There was not enough information available to be

6     able to use MADYMO.  So a computer program that can

7     simulate physics, simulate gravity, simulate human tissue,

8     it has to have definite points.  Like you have to say Mr.

9     Smith was standing at this point XY at this height and he

10    landed at this other point, XYZ.  And we have to know exact

11    distances, we have to know locations, position of rest.

12    Usually we talk of position of rest in terms of cars, but

13    in this case position of rest of Mr. Lopez's body.  And we

14    didn't have any of that.

15         Q.     What specific information was missing that

16    allowed you to determine that you could not use this

17    technology?

18         A.     Well, specifically there were no photos to show

19    where Mr. Lopez was located after the fall.  In particular

20    how far was he from the bridge, at what point on the bridge

21    did the incident begin.  And very importantly what was his

22    position of rest, what was the location of his body at the

23    end of this incident.  And the witnesses are all over the

24    place.

25         Q.     Is there any other information that you would

E. J. CHIU

1    have needed to use this technology?

2        A.    $20,000.

3        Q.    I mean information related to the incident like

4    facts or details about the incident, measurements.

5        A.    Well, sure.  I mean, if we're going to do a true

6    MADYMO, we're going to want to know what the friction was

7    between his shoes and the ground.  So then we're going to

8    need to know was he standing on concrete, was he standing

9    on grass, was he standing on mud; what kind of shoes did he

10   have on.  What was weather that day; was it moist, was it

11   dry.  So those are just factors that will affect frictional

12   calculations.

13          And then in terms of the fall itself, we don't

14   know the exact point.  There is grass, there's dirt,

15   there's a little bit of concrete; what exactly did he land

16   on.  Those three elements have very different densities

17   when you land on them, so we would need to know what kind

18   of surface we needed to model.  There's one setting for

19   concrete, there's another setting for grass, hard dirt,

20   soft dirt.  These are all settings that could be placed in

21   MADYMO.

22       Q.    And you didn't have any of that?

23       A.    No, did not.

24       Q.    Now, I'm sure that you're aware that Mr. Lopez

25   alleges in this case that he was lifted up before he was

E. J. CHIU

1    pushed over the railing; you are aware of that, right?

2        A.    That's what his testimony stated.

3        Q.    Why would his shoes or the friction regarding his

4    shoes on the ground matter if that were the case?

5        A.    Well, depends whether you want to say for sure

6    that he was lifted and pushed over or could it have been

7    just a shove, because that would have been safely exactly

8    where he landed.

9             Within the context of modeling, that would be

10   something to try.  If we have a person standing next to

11   rail, their center of gravity is already higher than the

12   rail.  What would it take to just push them and make them

13   fall backward versus lifting and pushing, that's something

14   that MADYMO would be useful to look at.

15       Q.    But I guess my question is:  Specifically, why

16   would that be important to look at if Mr. Lopez's testimony

17   is both of my feet were lifted off of the ground before I

18   was pushed over the railing?

19       A.    Well, as in the case in many analyses, exactly

20   what one witness says may not be correct.  There are a

21   number of times when one person says he was face up, he was

22   face down, he was facing feet towards versus feet away.  If

23   you're asking me would I do my modeling based solely on one

24   witness' testimony, I would say no.  I mean, I would model

25   a push.  I would model a lift.  I would model hanging from

E. J. CHIU

1      it and seeing how one's trajectory would be different.

2          Q.      But if your final conclusion is that Mr. Lopez's

3      story is more credible or more likely than the officer's

4      story, than why wouldn't you credit Mr. Lopez's entire

5      story?

6                      MR. WILSON:  Objection to the form.

7          A.      Witnesses are, more or less, accurate depending

8      upon what part they're talking about.  Could he have been

9      lifted briefly and then pushed, that would be in the

10     differential.  I wouldn't -- I don't believe what anybody

11     says unless I can find data to support it or that I have

12     all the witnesses saying they saw the exact same thing.  So

13     it would have been part of something to explore if we had

14     more information to put into our expensive computer

15     program.

16         Q.      For the purposes of reaching a conclusion, did

17     you assume that -- Mr. Lopez's story that he was lifted

18     fully off the ground before being pushed, did you assume

19     that that was inaccurate?

20                     MR. WILSON:  Objection to the form.

21         A.      I did not assume that that had to be the case.  I

22     looked at it specifically from the standpoint of being

23     pushed.  One would think if you lifted someone and then

24     pushed them, it would be easier to push them over.  I

25     looked at difficulty in just pushing someone.

E. J. CHIU

1    Q.    Do you reach the same conclusion, that his feet

2    were on the ground when he was pushed?

3                    MR. WILSON:  Objection to the form.

4    A.    Yes.

5    Q.    And in reaching your conclusion, did you assume

6    that his feet were on the ground when he was pushed?

7                    MR. WILSON:  Objection to the form.

8    A.    The important point is that he was standing with

9    his back towards the park, with his back or buttock on a

10   rail, and then he fell and landed on his head.  So to me it

11   was determining what is the mechanism, what kind of force

12   does one need to rotate the body 180 degrees like that.

13   How could that force have occurred, given the varying

14   stories that we have.  And his being pushed with or without

15   lifting is the best explanation for landing on his head.

16   Q.    Referring back to Exhibit C --

17   A.    Which one is C again?

18   Q.    It's the invoice.

19   A.    Got it.

20   Q.    I want to go to the entry that appears

21   underneath, the one we were just talking about.

22   A.    Sure.

23   Q.    The entry is for November 15, 2018?

24   A.    Correct.

25   Q.    And that's billed by Dr. Yamaguchi, right?

E. J. CHIU

1   any particular witnesses' statements.  There were too many

2   pieces that weren't fitting.  So it was better to go to

3   what I have objectively in the medical records.  I have

4   this X-ray and I could see there's this burst fracture.  I

5   know it takes a lot of energy, that had to come straight

6   down the spine to cause that.

7           And then I look at the CT scan of the head and I

8   see edema on the back of his head.  And there was a mention

9   in the CT scan here of upper frontal scalp edema, which

10  meant there was contact there that was on the initial head

11  CT.

12          So there was some head contact. And there had to

13  be head contact to cause this neck fracture, unless an

14  alien broke his neck on the way down.

15      Q.     So the objective evidence says he couldn't have

16  landed on his back?

17      A.     Correct, not on the initial impact.  Did he land

18  on his head and flop back, I don't know.

19      Q.     Can you please look at page 15 of your report?

20      A.     Sure.

21      Q.     So looking at the top, Doctor, underneath the

22  heading it says "Conclusions," the first paragraph?

23      A.     Yes.

24      Q.     The end of that paragraph you say, "I have

25  reached the following conclusions and hold each to a

E. J. CHIU

1    reasonable degree of scientific and biomechanical

2    engineering certainty"?

3        A.      Correct.

4        Q.      What do you mean when you say "reasonable degree

5    of scientific and biomechanical engineering certainty"?

6        A.      I would say based upon the evidence first is the

7    most likely conclusion, but I know they talk about more

8    likely than not.  I believe it's the more likely method of

9    injury or mechanism of injury, given the evidence that I

10   have.

11       Q.      Is there an agreed-upon definition of that term

12   in the field of biomechanics?

13       A.      No.  You mean like "reasonable degree," no.

14       Q.      Is there any agreed-upon definition of the term

15   in the field of emergency medicine?

16               MS. KUAN:  Objection to form.

17       A.      Oh, that's completely different.

18               MS. KUAN:  I'm also going to object to the

19               prior question.

20       A.      May I have whatever question I should answer

21   next?  Sorry.

22       Q.      Is there an agreed-upon definition of the term

23   "reasonable degree" in the field of emergency medicine?

24               MS. KUAN:  Objection to form.

25       A.      There's reasonable -- I don't know if I would use

E. J. CHIU

1    the term "degree."  Say in malpractice there's something

2    bad has happened and they want to know did the doctor miss

3    something, so then they talk about what is reasonable

4    practice, you know, that ordinarily a doctor should see

5    this and order this and do this.

6           So with malpractice we're acting outside of

7    what's reasonable practice, but I don't know if we talk

8    about a reasonable degree per se in emergency medicine.

9    Q.    Doctor, but you used this term so I'm just

10   wondering what you meant when you used this term,

11   "reasonable degree of scientific and biomechanical

12   engineering certainty."  What did you mean when you wrote

13   that?

14   A.    Well, that wasn't medicine.  Scientific -- well,

15   medicine is scientific in some ways, but much of medicine

16   is very anecdotal.  So what I mean "scientific," I'm

17   putting my engineer hat on and I'm making calculations and

18   I'm saying based upon what we have applying science,

19   physics, Newton's Laws, I'm reasonably certain that these

20   conclusions are true.

21   Q.    If I understand you correctly, there's no

22   authority that sets the definition of that term as you used

23   it?

24   A.    "Reasonable degree," no.

25   Q.    And I think you said earlier, in your mind it's

E. J. CHIU

1    A.    Backward.

2    Q.    -- backward than with him jumping over the

3    railing and then falling after hanging from the railing or

4    vegetation, right?

5    A.    Correct.

6    Q.    What other scenarios did you consider?

7    A.    Well, there were different accounts.  I believe

8    Officer Linares said he kind of swung his legs over, almost

9    kind of imagine doing one of those horse vaults, didn't

10   know which way, and then disappeared.  So I thought okay,

11   we're going to swing our legs over feet-first, is there a

12   way we end up on our head.  That didn't work out.  It's

13   going to be a feet-first fall.

14   Q.    Where is that reflected in your report, Doctor?

15   A.    The -- I couldn't give you every single way that

16   someone could fall.  I mean, if you want we could spend

17   some time, I could tell you all the things I considered.

18   But these were the ones that were the major question,

19   because the question is did he get pushed or did he just

20   fall or slip.

21   Q.    I think the question is a little bit more

22   specific than that.  This is written because it's not just

23   did he get pushed over the railing backwards versus did he

24   fall; it's did he get pushed over the railing backwards

25   versus did he fall after hanging from branches.  Those

E. J. CHIU

1    appear to be the two scenarios that you were determining

2    which one was more likely than not, right?

3        A.    Right.  And Linares' -- correct me if I'm wrong,

4    but I believe Linares who was the closest said he was

5    hanging.  That is why I went with the hanging.

6        Q.    And you credited that, right?

7        A.    Somewhere possibly.  Hold on.

8        Q.    That was part of the scenario that you were

9    operating under, right?

10       A.    Correct.

11       Q.    And you determined that Mr. Lopez's scenario was

12   more likely than Officer Linares' scenario, right?  That's

13   all I'm getting at.

14       A.    That's correct.

15       Q.    And you said you considered other scenarios.  So

16   my question for you is:  Why aren't those other scenarios

17   reflected in this report?

18       A.    Because there wasn't testimony or evidence to

19   support that.  Most important were the individuals that

20   actually saw what happened.  And Officer Linares was the

21   closest and Mr. Lopez was of course the subject.

22             You could speculate all different ways how you

23   could end up on one's head, just trying to think and see

24   are any of these consistent with what witnesses said or

25   evidence that we found, and I tried to stick with what had

E. J. CHIU

1    A.    Bending forward.  And there are compression

2  fractures that are solely what they call anterior wedge

3  compression fractures.

4    Q.    In order for Mr. Lopez to sustain that particular

5  injury, is it necessary that his head was bent forward?

6    A.    As part of the landing, yes.  So he would have

7  started and then started bending, so he might have started

8  to impact on the top and then bend forward in order to

9  compress the interior parts of the vertebra.

10   Q.    So this injury could not have occurred without

11  flexion?

12             MS. KUAN:  Objection.

13   A.    That is usually the case and that's what the

14  literature says.  I believe that's true.

15   Q.    Are you aware of any tests or literature that

16  look at angular momentum or velocity in this exact type of

17  situation, a person falling from a height or being pushed

18  from a height?

19   A.    Specifically to address angular momentum, I think

20  the most interesting literature is to look at diving

21  literature because in diving literature you have a person

22  facing forward and then they're flipped and they're 180

23  degrees facing the other way when they go into the water.

24  And they're doing that solely based upon the friction

25  between the diving board and force that they're applying to

E. J. CHIU

1    their body.

2            But any force that they apply to cause rotation

3    has to happen before they leave the board.  So once they're

4    spinning already in air, they can't add any more force.

5    They can make themselves spin faster or slower by pulling

6    in like ice skaters do, by changing their density and

7    making their mass more compact, but they cannot add any

8    external energy once they left the diving board.

9        Q.     But in the situation described by Mr. Lopez there

10   is an external force, it's Officer Linares, right?

11       A.     Presumably, yes.

12       Q.     Well, that's what he says happened to him, right?

13       A.     That's what he says happened to him.

14       Q.     He says that he was pushed by officer Linares,

15   right?

16       A.     Correct.

17       Q.     So I guess my question for you is:  Are you aware

18   of any literature or tests that focus on that type of

19   situation, where a person is pushed by someone else and not

20   just using their own force or friction to make themselves

21   rotate forward?

22       A.     Let me think.  I think a literature like that

23   would be anecdotal, because people are not going to allow

24   themselves to just get pushed off of something.

25           And then the other issue is that there is no

E. J. CHIU

1    crash dummy or ATD, anthropometric test dummy, that could

2    simulate because those things don't move.  So you could

3    throw something off of a height, but it wouldn't have any

4    muscle tone.  It wouldn't bend at the spine, head, and

5    neck.  So I am not aware of studies of pushing people off

6    of a high object to see how they fall.

7        Q.    And you're not aware of any literature to that

8    effect either?

9        A.    The literature that I'm aware of was mentioned in

10   terms of -- there's a fun study out of Florida where the

11   students that would visit this particular area and trauma

12   center would be often intoxicated.  So they did a study to

13   decide, looking at the injuries could they tell if the

14   person like jumped intentionally or did they fall and what

15   kinds of injuries did they incur -- were found more

16   predominately in one versus the other.  It also affects

17   sometimes if they're trying to decide whether someone

18   committed suicide or that they fell.

19       Q.    Right.  But that literature or that study

20   specifically didn't address a person being pushed, right?

21       A.    No, it didn't address being pushed.

22       Q.    So, as far as you can tell, you're not aware of

23   any literature that addresses a situation where a person is

24   pushed?

25       A.    I am not aware.  I would love to read it, though.

E. J. CHIU

1    Linares said he didn't lift him at all.  Linares said he

2    wasn't even there.

3        Q.    And you chose, based on the evidence, Mr. Lopez's

4    version was more likely than not, right?

5        A.    Mr. Lopez's version that something happened

6    between him and somebody else pushing him over the railing,

7    yes.  But details within there, I'm going to go by what I

8    can physically see and measure.

9        Q.    And you couldn't measure how far off the ground

10   Mr. Lopez was lifted by Mr. Linares?

11       A.    You mean if he was lifted, even though Linares

12   says he wasn't there?

13       Q.    I'm really focusing on Mr. Lopez's version right

14   now, which is the version you said is more likely than not,

15   and in his version he says that he was lifted.

16       A.    Okay.

17       Q.    So I'm saying:  Based on Mr. Lopez's testimony

18   you couldn't determine how far he was lifted off the

19   ground, right?

20       A.    No, and it wasn't relevant.

21       Q.    But why is it not relevant?

22       A.    Because he could have pushed him without lifting

23   him and had the same result or he could have lifted him up

24   and he'd come back down and then pushed him and have the

25   same result.

E. J. CHIU

1    Q.    I understand that, Dr. Chiu, but no one says --

2    no one says that Mr. Lopez was pushed while standing --

3              MS. KUAN:  Objection.

4    Q.    Not Mr. Lopez and not Mr. Linares.

5              Mr. Lopez says he was lifted up.  So why did you

6    make your calculation based on him standing when no one

7    says that he was standing?

8    A.    Because that's the harder position to push

9    someone from.  We try to be conservative and look at the

10   more difficult thing to do.

11             In engineering, when we make calculations there

12   are always estimates and we try to be conservative with

13   ranges of delta-v of vehicle crashes.

14             So if I wanted to make it seem really easy I

15   could say, oh, Linares was definitely lifted and thrown

16   over the wall, but I don't have evidence necessarily to

17   support that.  I'm saying he could have just been pushed,

18   he could have accidently pushed backward over the wall and

19   that's how he ended up on his head.

20             If you want to lift him, Linares is a strong guy,

21   we could say, okay, he lifted him.  But he doesn't have to.

22   Q.    Do you know whether it was even possible for

23   Officer Linares lift Mr. Lopez?

24             MS. KUAN:  Objection.

25   A.    No, I don't.

E. J. CHIU

1     Q.     Do you know how strong he is?

2     A.     I've never met Mr. Linares.  I don't know if he

3     works out at a gym.  Let's see, 70 kilos.  Some guys can

4     lift 200 pounds.  I know I can lift a 200-pound patient

5     briefly, an inch or two.  So I would guess that an officer

6     that's in good shape, especially with a lot of adrenaline

7     running around in his system, could lift someone an inch.

8     Q.     But you don't know either way, right?

9     A.     No, I didn't consider it necessary for his

10    injury.

11    Q.     Do you know where Officer Linares' hands were

12    situated on Mr. Lopez's body when he allegedly lifted him

13    up?

14    A.     Are you talking about Linares or are you talking

15    about according to Lopez?  Because Linares wasn't there,

16    according to his version.

17    Q.     Again, we're still with Mr. Lopez's version of

18    events.

19    A.     I believe Mr. Lopez said something about grabbing

20    the front of his jacket.  I could look up the exact thing,

21    if you want me to.

22    Q.     Do you know how much force Officer Linares used

23    when he pushed Mr. Lopez over the fence?

24    A.     No.

25    Q.     Would that affect your calculation in any way?

E. J. CHIU

1      A.      I thought about is there a way to calculate how

2    much that would take.  And it's extremely complicated

3    because we don't know if there was a lift, we don't know if

4    his feet were on the ground, we don't know the friction, we

5    don't know about the friction between him, the back of his

6    clothes, and the railing.  We don't know whether Mr. Lopez

7    had a very stiff body when he got pushed or was he more

8    limp.  There is so many variables that can't be calculated.

9           I thought about trying to calculate.  The best I

10   could come up with is so if I took a two-by-four and I

11   flipped it over a rail, how much force would I have to give

12   it to get to 180 degrees?  But then that totally depends on

13   how much is it digging into the ground, how high am I

14   hitting this.  There are too many variables.  You could be

15   off by a factor of 10 to 20 even trying to estimate.

16      Q.      Is there a force that Officer Linares could have

17   used that would have gotten him past Mr. Lopez, past 180

18   degrees?

19           MS. KUAN:  Objection.

20      A.      I'm sorry, say it again.

21      Q.      In other words if Officer Linares pushed Mr.

22   Lopez with sufficient force, is it possible that his body

23   could have rotated past 180 degrees?

24           MS. KUAN:  Objection.

25      A.      It would be a lot of speculation and it would

E. J. CHIU

1  depend on whether when Mr. Lopez fell, whether he tried to

2  keep his body straight, whether he was limp, if he is bent

3  in the middle.  There are way too many variables to know.

4  We know that a diver can leap off a board and spin multiple

5  times.  That's much more than 180, so it's physically

6  possible.  Could Linares -- I could make some rough

7  calculations, but they would be very rough and it would not

8  be able to tell you for certain.

9      Q.    Does cocaine make a person's body stiff?

10              MS. KUAN:  Objection.

11     A.    It would depend on the individual.  If it was a

12  cocaine overdose and they were, you know, intubated in ICU

13  and their muscles were really tight, it could make them

14  stiffer.  But just being high on cocaine, I don't think

15  there are any studies that talk about increase muscle tone.

16     Q.    What about heroin, would it make his body limp?

17     A.    Heroin?  If someone were acutely intoxicated with

18  heroin, it's a depressant.  It could lead to less muscle

19  tone, that's why we stop breathing.  Theoretically a high

20  dose of heroin, someone could be limp or falling down.

21     Q.    And same question for methadone, would it make a

22  person's body limp?

23     A.    That's an interesting question.  Methadone

24  depends on the individual.  It depends how long they've

25  been on a current dose and whether they're supplementing

E. J. CHIU

1    their prescribed methadone dose with any street Valium,

2    street heroin, whatever.

3              The common methadone clinic that people go to,

4    they have to show up, they call it a juice bar.  They show

5    up every morning usually and they get a little cup that's

6    allotted out of their number of milligrams of methadone,

7    it's a liquid.  That's how they could control the patients.

8    It's also available in tablet form but not for opium, at

9    least in California.  And I believe in this country, not

10   for maintenance of opium withdrawal.  People have to go to

11   a juice bar.

12             So patients that I have seen that have been on

13   long-term methadone, I've seen them in the evening

14   sometimes and they are, what I call, like, nodding off.

15   But these are often like homeless people, too.  They're not

16   limp, nodding off.  And I'll say hey, you know, you're

17   complaining of chest pain, you're sound asleep and they'll

18   wake up, I'm not asleep.

19             So there's a range of what happens in an

20   individual.  If it was a brand-new methadone dose for a

21   person, possibly it could make them limp.  But if someone

22   had been on 100 or 200 every single day for more than a

23   month, it should be a pretty steady state and they're not

24   supposed to have those kinds of effects.

25   Q.      So getting back to your conclusions, Doctor, you

E. J. CHIU

1    determined that Mr. Lopez's body rotated 180 degrees?

2        A.    Correct.

3        Q.    And he landed on his head?

4        A.    On his head.

5        Q.    Is that the determination that you started with

6    in reaching your conclusions?

7        A.    What do you mean?

8        Q.    Did you start from that premise and then work

9    your way backward?

10            MS. KUAN:   Objection.

11        A.    No.   You mean the premise of him rotating 180

12    degrees?

13        Q.    Correct.

14        A.    No.   No, I did not.

15        Q.    But you started from the premise that he had to

16    land on his head?

17        A.    Correct, to cause the injuries.

18        Q.    And which, we discussed earlier, means that his

19    spine didn't necessarily have to be 90 degrees to the

20    ground; it could have had the range that we talked about

21    earlier between 5 and 7 o'clock?

22        A.    Right, I believe 170, 190, you know, in terms of

23    his flipping over.

24        Q.    Did your calculations allow for Officer Linares

25    using more force than was necessary to produce Mr. Lopez's

E. J. CHIU

1    Q.    Why don't we do it this way:  Can you turn to

2    page 13 of the report?

3    A.    Sure.

4    Q.    I am referring to the second paragraph from the

5    bottom.

6    A.    Yes.

7    Q.    The last sentence.  "Under the scenario described

8    by Mr. Lopez, the total height of his fall was

9    approximately 14 feet.  The kinetic energy at impact was

10   2,676 foot-pounds.  And the speed of impact was,

11   approximately, 20 miles per hour."

12   A.    Correct.

13   Q.    So based on Mr. Lopez's version of events that

14   was the kinetic energy at impact, 2,676 foot-pounds?

15   A.    That's fair.  But it doesn't have to be Mr.

16   Lopez's scenario; it's just based on measurements.

17   Q.    And that combination of energy and speed is

18   enough to break a person's neck?

19   A.    Yes, it is.

20   Q.    You also calculated the kinetic energy that Mr.

21   Lopez's impact with the ground based on Officer's Linares'

22   version of events, right?

23   A.    This would be dangling from a rail.

24   Q.    Correct.

25   A.    Correct.

E. J. CHIU

1     Q.    How many times did you visit the site of the

2  incident?

3     A.    Just once.

4     Q.    When you were there you said you took photos of

5  the site, correct?

6     A.    Correct.

7     Q.    Did you examine the ground where Mr. Lopez

8  landed?

9     A.    Yes, I did.

10    Q.    Did you go down to the ground where he was, where

11  he landed?

12    A.    Yes, it was nice and soggy and muddy that day.

13    Q.    Do you know -- but you visited in December of

14  2018, right?

15    A.    Yes.

16    Q.    And this incident occurred in December of 2015,

17  right?

18    A.    Correct.

19    Q.    Was the ground where Mr. Lopez landed flat?

20    A.    Not flat like a perfect plain.  There was dirt,

21  there were roots.  I used what's called an inclinometer

22  where it gives you the angle of the dirt at a given point

23  and measured it at several points.  It got down to maybe 5

24  degrees.  It was higher as one climbed up the slope more

25  towards the Crotona North buildings.

E. J. CHIU

1    Q.    Are those calculations included in your report?

2    A.    Those are not calculations.  They're measurements

3    that are on my pictures.

4    Q.    Are those measurements included in your report?

5    A.    No.

6    Q.    Did those measurements affect your calculations

7    in any way?

8    A.    No.

9    Q.    Isn't it important whether or not he landed on a

10   flat surface or a sloped surface?

11   A.    It depends how high of a slope you would mean.

12   If he landed on a 45-degree slope, certainly yes.  But

13   something as shallow as 5 to 7 degrees with dirt and mixed

14   concrete, we don't even know the exact impact point.  There

15   was no way to know.  This is where if we could MADYMO we

16   would want to know exactly the point, what was the

17   material.  And we just don't have it.

18                 MS. KUAN:  Let's take a quick break.

19                 THE WITNESS:  Yes.

20                 (Whereupon, a brief recess was taken.)

21   Q.    Doctor, we are back from the break.  Would you

22   like to change any of your answers you've given up to this

23   point?

24   A.    We were talking about cervical spine potential

25   for injury.  And I just wanted to clarify a couple of

E. J. CHIU

1    Q.    -- and ask you whether or not they contributed to

2    your conclusion in any way.

3    A.    Okay.

4    Q.    So looking at the summary of the hearing of

5    Officer Luis Linares, did your review of that material

6    affect your conclusion in any way?

7    A.    Hold on, just a minute.  Let me double-check.

8          You know, I'm not positive when I have this

9    testimony section if it was their summary of hearing or

10   whether it was their actual depo.  For example there is a

11   summary hearing of Luis Linares and summary hearing, but my

12   sense is probably no and the depositions were where these

13   quotations were from.

14          So to get back to your question, that would be no

15   on bullet point 1 and bullet point 2.

16   Q.    So getting to bullet point 2, the summary of Luis

17   Angeles' hearing didn't affect your conclusion in any way?

18   A.    With the caveat -- I have to clarify.  I don't

19   know for certain which part I quoted out of a hearing

20   versus his testimony.  I just took it as the same source.

21   So it could have been, because wherever I quoted I was

22   obviously referring to something he said.

23   Q.    But in terms of your ultimate conclusion you

24   credited Mr. Lopez's version rather than Officer Linares'

25   version, correct?

E. J. CHIU

1      A.      I don't know that anybody is a hundred percent

2   correct.  I'm just trying to look at the injuries based on

3   location and see how he ended up on his head.  So as a

4   whole, it tends to correlate more with what Mr. Lopez said

5   than Mr. Linares.

6      Q.      The same for Officer Angeles, it tends to --

7      A.      Hold on, let me just see what Angeles said.

8              Angeles didn't see in his testimony the actual

9   fence or railing thing.  He talks about seeing Linares

10  stopped to pick up his badge, I believe.  So there wasn't

11  anything in here that I would disagree necessarily with

12  his.  I don't think it supported one way or the other.

13     Q.      So it was neutral?

14     A.      Neutral.

15     Q.      And your review of the deposition of the Luis

16  Linares, did that affect your conclusion in any way?

17     A.      I scrutinized his description to attempt to have

18  Mr. Lopez fall the way he described and that didn't match

19  up with my ultimate conclusion.  So I would say I looked at

20  it very closely to have this as an alternative, but it

21  didn't ultimately meet what I found the mechanism of his

22  spine injury was.

23     Q.      And your review of plaintiff's deposition, Mr.

24  Lopez, that correlated with what you thought was the

25  mechanism of injury, right?